**MISSOURI CONSOLIDATED HEALTH CARE PLAN, Appellant/Cross–Respondent,**

v.

**COMMUNITY HEALTH PLAN, Respondent/Cross–Appellant.**

**Nos. WD 59012, WD 59076.**

Missouri Court of Appeals, Western District.

March 29, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 28, 2002.

Application for Transfer Denied Aug. 27, 2002.

Gerald P. Greiman, St. Louis, Eugene G. Bushmann, Jefferson City, for Appellant/Cross–Respondent.

R. Dan Boulware, St. Joseph, Johnny K. Richardson, Jefferson City, for Respondent/Cross–Appellant.

PAUL M. SPINDEN, Chief Judge.

Community Health Plan, a health maintenance organization, contracted with Missouri Consolidated Health Care Plan to provide health care benefits for state employees and other public entities in Missouri. When Community began experiencing substantial financial losses under the MCHCP contract and when MCHCP refused to allow Community to increase its premiums, Community decided to eliminate a large portion of its provider network for state employees. MCHCP responded by filing this action for declaratory relief, specific performance, and injunctive relief. Community filed counterclaims for fraudulent representation, fraudulent nondisclosure, negligent nondisclosure, unilateral mistake, breach of contract, and breach of duty of good faith and fair dealing.

MCHCP filed motions for judgment on the pleadings and for summary judgment, asserting that sovereign immunity barred Community's claims for fraudulent representation, fraudulent nondisclosure, and negligent nondisclosure. Although the circuit court agreed that MCHCP was entitled to sovereign immunity, it concluded that it would consider Community's claims for fraudulent representation, fraudulent nondisclosure, and negligent nondisclosure as contract claims rather than as tort claims. The circuit court also determined that the legal issues raised by Community's counterclaims would be tried to a jury and that the equitable issues raised by MCHCP and Community would be taken with the case to be decided after the jury's verdict.

The jury determined that, before Community bid in response to MCHCP's requests in 1995, 1996, and 1997 for proposals to provide health benefits to MCHCP members, MCHCP falsely represented to Community that historical claims and utilization data on the proposed insured group was not available. The jury also determined that MCHCP breached an implied covenant of good faith and fair dealing in the 1997 request for proposal (RFP)

contract by refusing to give Community a rate increase beyond the consumer price index (CPI) cap. The jury awarded $14.5 million to Community on these claims. The jury found for MCHCP on Community's claims that it should have received rate increases under the 1995 and 1996 RFP contracts in excess of the CPI cap. In accordance with the jury's verdict, the circuit court entered judgment for Community and stated that it would bear interest at nine percent and that costs would be assessed against MCHCP.

After the jury's verdict and the entry of judgment, the circuit court determined the remaining equitable issues. It entered a permanent injunction prohibiting Community from reducing its provider network and from not performing its contractual obligations with MCHCP. It also concluded that, because Community affirmed the contracts by submitting its claims for damages under a breach of warranty *ex contractu* action, Community abandoned its claims and affirmative defenses that sought to disaffirm the contracts. The circuit court found:

> MCHCP has the right, at its sole option, to extend the 1995 and 1996 RFP Contracts for up to four additional one year periods and to extend the 1997 RFP Contract for up to two additional one year periods, provided, however, that the parties establish a mutually agreeable rate (price). If a rate is not so established, [Community] may terminate the contracts upon 60 days advance written notice.

The circuit court also decided that the MCHCP funds, which were segregated and set aside in lieu of an injunction bond, should continue to remain segregated.

The circuit court further announced that it was retaining jurisdiction "to resolve matters pertaining to the establishment of the rate (price) of continued coverage under the current contracts and to resolve matters pertaining to damages suffered by [Community] under the contracts since April 13, 2000." It also retained jurisdiction to consider matters pertaining to the injunctive relief granted by its judgment. The circuit court, however, determined that no just reason required delay and that the parties could proceed "as they deem[ed] appropriate." MCHCP and Community filed cross appeals.

### Breach of Warranty *Ex Contractu*

In its first point on appeal, MCHCP contends that the circuit court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict because Community did not make a submissible case on its breach of warranty *ex contractu* claims. MCHCP asserts that the circuit court could not recast Community's misrepresentation claims as breach of warranty *ex contractu* claims because the evidence did not establish that MCHCP made a positive representation upon which Community relied. MCHCP argues that Community's misrepresentation claims were tort claims barred by sovereign immunity.

In reviewing the circuit court's denial of MCHCP's motion for directed verdict and judgment notwithstanding the verdict, we must determine whether Community made a submissible case. *Spring v. Kansas City Area Transportation Authority*, 873 S.W.2d 224, 225 (Mo. banc 1994). In making this determination, we review the evidence and all reasonable inferences in the light most favorable to the jury's verdict and disregard contrary evidence. *Nemani v. St. Louis University*, 33 S.W.3d 184, 185 (Mo. banc 2000), *cert. denied*, 532 U.S. 981, 121 S.Ct. 1623, 149 L.Ed.2d 485 (2001). Whether evidence is substantial and whether the inferences drawn from it are reasonable are questions

of law. *Simpson v. Indopco, Inc.*, 18 S.W.3d 470, 473 (Mo.App.2000). We will reverse judgment on the basis that insufficient evidence supported the jury's verdict "only where there is a complete absence of probative fact to support the jury's conclusion." *Giddens v. Kansas City Southern Railway Company*, 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied*, 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001). When reasonable minds can differ on a question put to a jury, this court should not disturb the jury's verdict. *Washington v. Barnes Hospital*, 897 S.W.2d 611, 615 (Mo. banc 1995).

Community's misrepresentation claims, as submitted to the jury, asserted breach of warranty *ex contractu*. Community averred that MCHCP falsely represented to it that historical claims and utilization information [1] on the proposed insured group was not available to it before it bid on the 1995, 1996 and 1997 RFP contracts and that such representations were material to its bids. Community contends that, had it had this information, its bids would have been higher, and higher bids would have generated more revenues from the MCHCP contracts.

To recover against a governmental entity for breach of warranty *ex contractu*, a contractor must establish that the governmental entity made a positive representation of material fact that was false, that the contractor did not know the representation was false, and that he sustained damages as a direct result of the misrepresentations and his reliance on it. *Ideker, Inc. v. Missouri State Highway Commission*, 654 S.W.2d 617, 621 (Mo.App.1983). The cause of action focuses on a warranty—a form of guarantee and synonymous to a promise—concerning the character, quality and nature of the contract's subject matter. Because such issues are a "narrow niche in the vast body of case law," the *Ideker* court recognized that, to allow a cause of action for breach of warranty *ex contractu*, courts had to reconcile the cause of action with two countervailing principles:

> The first being that since damages were sought in connection with work performed on a public project under a contract with a governmental entity, the party sought to be held liable, the doctrine of sovereign immunity precluded a cause of action ex delicto (fraudulent misrepresentation). The second being a well established principle of contract law, finding clarity of expression in *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), that when one agrees to do a thing possible of performance "he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered."

*Id.* at 620, 621. In a later decision, Judge Ronald Somerville, the author of *Ideker*, admonished:

> The theory of recovery identified with Ideker, Inc. v. Missouri State Highway Commission ... was never intended to be a panacea for every successful bidder whose costs overrun the bid price. Hence, the emphasis upon a *positive representation* of a material fact by a governmental entity which is false or incorrect and relied upon by a contractor. Otherwise, this innovative theory of recovery could never be reconciled with the well-established principle of contract law, finding clarity of expres-

---

1. The claims information was a list of claims and their cost for a certain period. The utilization information was the number of claimants' medical consultations, their hospitaliza- tions, the average length of their hospital stays, and their use of pharmaceutical services.

sion in *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), that when one agrees to do a thing possible of performance "he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Sanders Company Plumbing and Heating, Inc. v. City of Independence,* 694 S.W.2d 841, 850–51 (Mo.App.1985) (Somerville, J., dissenting).

MCHCP asserts that its informing Community that its historical claims and utilization data on the proposed insured group was not available was not a positive representation; therefore, Community did not make a submissible case on its breach of warranty *ex contractu* claims. We agree.

■ "[A] *bright* line is drawn between 'positive' or 'affirmative' representations and representations of a lesser degree which are merely implied or suggestive. A 'positive' or 'affirmative' representation distinguishes an actionable representation from one which is merely implied or suggestive." *Ideker,* 654 S.W.2d at 624 n. 3 (emphasis in original). Too, the Supreme Court has instructed that "[t]here is a distinction between a representation and a warranty. A representation is not, strictly speaking, a part of the contract, or the essence of it, but rather something collateral or preliminary, and in the nature of an inducement to it, while a warranty enters into and forms a part of the contract itself." *Grand Lodge of the United Brothers of Friendship and Sisters of the Mysterious Ten v. Massachusetts Bonding and Insurance Company,* 324 Mo. 938, 25 S.W.2d 783, 787 (Mo. banc 1930).

In asserting that MCHCP made a positive representation, Community does not point to any misrepresentations of warranty within the RFPs but to statements made by Ron Meyer, MCHCP's executive director. Community alleged that Meyer said during the pre-bid conferences that claims and utilization information was not available. In instructing the jury, the circuit court hypothesized the alleged misrepresentation: "[P]rior to Community Health['s] bidding on the ... RFP Contract, [MCHCP] represented to Community Health that historical claims and utilization data on the proposed insured group was not available[.]" MCHCP acknowledges that it did possess the information.

Meyer's representation that the information was not available was not a positive representation. The representation was ambiguous, subject to varying interpretations, and, at most, it was an implied representation. It may have implied that MCHCP did not possess the information, but no business person could have reasonably taken the statement as a *positive* representation that MCHCP did not have the information. As an implied or suggestive representation—not a positive one—it did not satisfy the requirements for a submissible case of breach of warranty as to the nature of the contract that Community agreed to undertake.

We recognize that this court, in *Schmelig Construction Company, Inc. v. Missouri State Highway Commission,* 543 S.W.2d 265, 267 (Mo.App.1976), suggests in *dictum* that, if a contractor requests information possessed by the governmental entity about a project and the governmental entity does not furnish that information, the contractor may have a cause of action for breach of warranty of the plans and specifications. In reaching this conclusion, however, the *Schmelig* court relied on *Walla Walla Port District v. Palmberg,* 280 F.2d 237 (9th Cir.1960). *Schmelig,* 543 S.W.2d at 267. Its reliance on *Walla Walla* was misplaced because, as the federal court noted, *Walla Walla* involved an im-

plied representation, not a positive representation.

In *Walla Walla*, a port district requested bids for a construction project. Before submitting a bid, a contractor asked the consulting engineer about the subsoil conditions in the area to be dredged and specifically requested a copy of a report submitted by a firm of soil engineers about the condition of the soil and the borings made, which were shown on the general plan. The consulting engineer responded that the report "was not readily available, but that it did not provide any additional information that would be helpful, and that it was all essentially on the plans, and that he had no further knowledge that would be helpful to [the contractor] in submitting a bid." 280 F.2d at 237.

The project's specifications said that the subsoil in the dredging area was anticipated to be sand, silt and fine gravel. The specifications, however, instructed that the bidders were expected to examine the site and to study the records of "three churn drill holes located on the drawings . . . and information available in the office of the Engineer[.]" *Id.* at 243. The port district conceded that the drill holes and the soil report did not disclose the presence of rocks and boulders in the subsoil.

The evidence established that the consulting engineer knew that the subsoil contained a substantial quantity of boulders and rocks. The contractor specifically asked the engineer whether he had any information about the subsoil, but the engineer did not disclose what he knew. The court said, "[T]here is the element of superior knowledge on the part of [the port district] as to the subsoil conditions, and the failure to disclose such knowledge or the means of knowledge to the [contractor]." *Id.* at 245. The court determined that the port district made an "*implied representation* . . . that it had fully disclosed to [the contractor] all relevant information and knowledge in its possession concerning subsoil conditions." *Id.* at 248 (emphasis added).

■ The law in Missouri is that implied representations are not sufficient. The representation must be positive to give rise to a cause of action. *Ideker*, 654 S.W.2d at 617; *St. Louis Air Cargo Services, Inc. v. City of St. Louis*, 929 S.W.2d 821 (Mo.App.1996).

More importantly, even if the representation had been positive, it did not concern a material fact. Meyer did not make a warranty concerning the character, quality or nature of the contract's subject matter. His statement did not cause Community to believe that its contractual duties were different than those described in the RFPs. Community does not assert that anything within the bidding documents and RFPs contained any positive or affirmative representations that were false.

Typically in cases dealing with breach of warranty *ex contractu*, a governmental entity made the positive representation in a project's plans and specifications. *See Massman Construction Company v. Missouri Highways and Transportation Commission*, 31 S.W.3d 109 (Mo.App.2000); *Unnerstall Contracting Company, Limited v. City of Salem*, 962 S.W.2d 1 (Mo.App. 1997); *Sanders*, 694 S.W.2d at 841; *Ideker*, 654 S.W.2d at 617; *see also* Annotation, *Right of Public Contractor to Allowance of Extra Expense Over What Would Have Been Necessary if Conditions Had Been as Represented by the Plans and Specifications*, 76 A.L.R. 268 (1932). In these cases, contractors found after commencing work that representations made in the plans and specifications were false and that they would incur additional costs because of the false representations. As the *Ideker* court explained:

Syllogistically, where a governmental entity makes a *positive* representation of a material fact relied upon by a contractor in calculating its bid, which turns out to be false or incorrect after work is commenced and occasions additional expense, the contractor finds himself in the position of one who undertakes one contract but is confronted with performance of another. The governmental entity, pragmatically speaking, gets the benefit of another contract. If performance thereof by the contractor entails more expense than was calculated in submitting its bid, the governmental entity should bear the added cost rather than the contractor because the former is the beneficiary of necessary but unbargained for work resulting from its positive representation of a material fact which turned out to be false or incorrect.

654 S.W.2d at 621 (emphasis in original).

In *Ideker*, the highway construction contractor sued the highway commission for breach of warranty *ex contractu* on the ground that it was required to perform a contract for which it did not bargain. The plans and specifications relied upon by the contractor described the project as a "balanced job" and did not provide for any waste disposal areas. *Id.* at 619. Upon commencing the work, the contractor found that the job was not balanced, that the job required it to dispose of waste, and that it would incur additional costs. *Id.* at 620. This changed the contractor's performance.

In our case, MCHCP did not make any representations in the RFPs—or anywhere else—about how much work Community would have to perform or how much expense it might incur. Indeed, the circuit court found:

... MCHCP made no positive or affirmative representation as to what it might cost the bidders to provide coverage to the prospective insureds.

... MCHCP made no positive or affirmative representation to the bidders as to how much or how little utilization the prospective insureds might have.

... MCHCP made no positive or affirmative representation as to how the cost or utilization for its members might compare to the bidders' other business.

[Community] has not challenged the accuracy of any of the terms, conditions, and specifications set forth in any of the requests for proposals, the attachments, amendments or clarification thereto for any of the respective years (1995, 1996 and 1997).

The circuit court also concluded that Community had contracted to assume the risk of providing medical benefits to MCHCP's members.

Community relies heavily on *St. Louis Air Cargo Services, Inc. v. City of St. Louis*, 929 S.W.2d 821 (Mo.App.1996), as a case involving a claim identical to its claim. In *St. Louis Air Cargo*, city officials negotiated with St. Louis Air Cargo for the construction and operation of an air cargo facility at Lambert St. Louis International Airport. City officials represented that, if St. Louis Air Cargo would finance, build, and operate the facility, the city would centralize and consolidate all of Lambert's air cargo activities in the new facility. The representation was a warranty concerning the character, quality or nature of the facility to be built. St. Louis Air Cargo entered into a written lease and agreement with the city to lease 30 acres of land and to construct the facility. An exhibit to the lease showed all air cargo carriers as tenants of St. Louis Air Cargo's new facility. When the contractor completed the facility, the city did not consolidate all of the air cargo carriers into the facility as had been promised and allowed other tenants to

compete with St. Louis Air Cargo. St. Louis Air Cargo sued the city, asserting a claim for breach of warranty *ex contractu* based upon the city's false representation. The city filed a motion for summary judgment and argued that St. Louis Air Cargo did not establish that the lease expressly made a positive representation of a material fact regarding the consolidation of air cargo service. The circuit court granted the city's motion for summary judgment, and St. Louis Air Cargo appealed.

On appeal, this court's Eastern District determined that the city had made an "actionable representation:"

> A positive or affirmative representation distinguishes an actionable representation from one which is merely implied or suggestive. [*Ideker*, 654 S.W.2d at 624]. The representation can be words or other conduct amounting to an assertion not in accordance with the truth, or a statement made to deceive or mislead. *Clark v. City of Humansville, Missouri*, 348 S.W.2d 369, 373 [3, 4] (Mo.App. 1961). The representation is material if a reasonable person would attach importance to it in determining his choice of action in the transaction in question. *Id.*

> Here, it is uncontested that [the city] made statements prior to the execution of the Lease that all air cargo at Lambert would be consolidated into [the] new facility. These oral statements constitute an actionable representation. *See Clark, supra.* In addition, it is uncontested that subsequent to the execution of the Lease, [the city] made representations that all air cargo handling at Lambert would be consolidated into [the] new facility. Furthermore, it is uncontested that exhibit B to the Lease shows all of the air cargo carriers at Lambert parked at [the new] facility with specific storage space allotted to

each carrier as tenants. Plans and drawings which are incorporated into the contract also constitute an actionable representation. *See Ideker, supra.*

*Id.* at 826. The court reversed the circuit court's summary judgment and found that St. Louis Air Cargo had a cause of action against the city for breach of warranty *ex contractu.*

Community's contention that the claim in *St. Louis Air Cargo* is identical to its claim is wrong. Had the city told the contractor that it could not tell it how the city was going to use the air cargo facility—that it would have to bid without knowing this information—the claims would be identical. Instead of misrepresenting to the contractor that it did not have any information about how the air cargo facility was to be used, it misled the contractor about the city's intended use of it. The contractor factored the city's promises into its calculations concerning debt service and return on investment. The city had breached its warranties. *St. Louis Air Cargo,* therefore, involved a claim identical to *Ideker* and the other plans and specifications cases, but the case is quite dissimilar from Community's claim.

█ In Community's case, Meyer's representations that the claims and utilization information was not available did not alter the scope of work to be performed or of the benefits to be received by Community. Community was not faced with performance of a contract different from the one for which it had bargained for. Nor was it confronted with an unfulfilled benefit or expectation based upon the RFP contracts. Community's contract performance remained the same: to provide health care benefits to MCHCP members. Although the costs of providing those benefits may have been more than what Community expected, nothing within the RFP con-

tracts and nothing within the statements made by Ron Meyer that the claims and utilization information was not available represented what those costs would be or what benefits Community could expect to receive.

Equally important was evidence establishing that Community had access from other sources to the information that it sought. Claims and utilization data was included in MCHCP's 1994 RFP. MCHCP submitted the 1994 RFP to Community's parent corporation. Moreover, claims and utilization data was included in MCHCP's annual reports. Community certainly was not as "hamstrung" by MCHCP's not making the information directly available to it as it claims.

■ Moreover, MCHCP did not make a warranty about the contract, as was the case in *Ideker* and in *St. Louis Air Cargo*. MCHCP merely provided no information to Community. Community was advised in all of the RFPs that "the only official position of MCHCP is that position which is stated in writing and issued by MCHCP as a Request for Proposal and any amendments thereto. No other means of communication, whether oral or written, shall be construed as a formal or official response or statement." Implied representations may be negated by such "boiler plate provisions," which disclaim a contractor's reliance on any representations by the governmental entity. *Ideker*, 654 S.W.2d at 624 n. 3. This court has specifically recognized that governmental entities can best avoid liability for alleged misrepresentations by not making any representations at all:

[I]f those in charge of a public project wish to eliminate [the question of a positive representation] from any disputes with their contractors, they may do so in advance, first, by making very sure that any representations they make are accurate and, second, *by not making any representations as to the soil conditions and the like and by truly putting the entire burden upon the contractors to do their own pre-bidding investigations.*

*Sanders,* 694 S.W.2d at 847 (emphasis added); *see also Unnerstall,* 962 S.W.2d at 8. In essence, this is what MCHCP did. Without a promise, there can be no breach of promise. MCHCP made no representations about what it might cost Community to provide coverage to the prospective insureds, about how much or how little utilization the prospective insureds might have, about how the cost or utilization for its members might compare to other bidders. Indeed, Community in no way challenges the accuracy of any of the terms and conditions of the RFPs.

That Community desired more information from MCHCP before making its bid is understandable, but Community points to nothing that establishes that MCHCP made a positive misrepresentation or warranty about a material fact. MCHCP's failure to produce information or even its lying about the availability of the information cannot be likened to a breach of warranty under a contract. If Community believed that insufficient information had been provided, it was under no obligation to bid. Because Community placed bids, Community obviously felt that it had enough information to respond to the RFPs and to formulate its bid. Moreover, we discern no logic in an assertion that Community submitted its bid in reliance on MCHCP's telling it that the claims and utilization history was not available. Community insists that the claims and utilization history was material to its making a bid, but Community submitted a bid knowing that it did not have this information. Whether MCHCP's representation that the information was not available was true or false was not as material to Community

as it now contends because it submitted a bid to MCHCP anyway.

We, therefore, conclude that the circuit court erred in denying MCHCP's motions for directed verdict and for judgment notwithstanding the verdict on Community's breach of warranty *ex contractu* claims. Community did not make a submissible case to support such a claim.[2]

### Breach of Covenant of Good Faith and Fair Dealing

MCHCP also contends that the circuit court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict in regard to Community's claim for breach of the covenant of good faith and fair dealing in connection with the 1997 RFP contract. The jury determined that MCHCP breached the covenant of good faith and fair dealing in the 1997 RFP contract by refusing to give Community a premium rate increase beyond the CPI cap. MCHCP argues, however, that its failure to grant a premium rate increase above the contractual cap cannot constitute a breach of the covenant of good faith and fair dealing because the contract granted it unfettered discretion in regard to granting any increases beyond the cap.

The Supreme Court has pronounced that "Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Electric Cooperative, Inc. v. Missouri Department of Corrections,* 977 S.W.2d 266, 271 (Mo. banc 1998).[3] Although MCHCP recognizes that a duty of good faith and fair dealing is implied in every contract, it asserts that an implied covenant will not be inserted into the contract where the parties expressly address the matter at issue in their agreement. *See Crestwood Plaza, Inc. v. Kroger Company,* 520 S.W.2d 93, 98 (Mo.App. 1974), and *Conservative Federal Savings and Loan Association v. Warnecke,* 324 S.W.2d 471, 479 (Mo.App.1959). MCHCP argues that, if its conduct consisted merely of actions which it had the right to take within the discretion conferred by the contract, its conduct cannot be deemed a breach of the covenant of good faith and fair dealing. This is true, according to MCHCP, irrespective of whether it acted in good faith, bad faith or in its own self-interest.

The 1997 RFP contract provided:

---

2. Because we reach this conclusion, we need not address MCHCP's contentions that Community did not make a submissible case as to damages in regard to its misrepresentation claims, that the jury's award on the misrepresentation claims was not supported by substantial evidence, and that the circuit court erred in giving Verdict Form A on Community's claims of misrepresentation together with Verdict Form B on Community's claims of breach of express and implied contract.

3. In making this pronouncement, the Supreme Court relied on *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 368 (Mo.App.1996), which had relied on *Morton v. Hearst Corporation,* 779 S.W.2d 268, 273 (Mo.App.1989), which, in turn, relied on *Martin v. Prier Brass Manufacturing Company,* 710 S.W.2d 466, 473 (Mo.App.1986). In *Martin,* this court held, "It is a fundamental principle and concomitant of agreements that: 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.' Restatement (Second) of Contracts § 205 (1981). That duty prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract. 1A Corbin on Contracts § 165 (1963); Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization,* 67 Cornell L.Rev. 810, 821 et seq. (1982)." By relying on *Martin* and its progeny, we conclude that the Supreme Court has adopted, *sub silentio,* § 205 of the Restatement.

Any request for a price increase must be supported by documentation of adverse claims experience and/or any other such justification. In addition, such prices and extension terms shall be subject to negotiation (up to the medical CPI) between MCHCP and parties to the contract. All renewal requests shall be capped at a percentage equal to the change in the medical component of the Urban Consumer Price Index for April of each year. However, rates may be increased over the CPI cap at the discretion of the MCHCP Board of Trustees. To receive this consideration, the contractor must provide substantial evidence of a significant adverse financial condition in regard to this contract and pay for an audit of such data by a reputable and qualified third party to be selected by MCHCP.

MCHCP asserts that Community is attempting to use the implied covenant of good faith and fair dealing to impose an independent obligation on MCHCP—to grant premium rate increases above the CPI cap—that is not found in the express terms of the agreement.

MCHCP misunderstands its obligations, however, in regard to its duty of good faith and fair dealing. This duty did not impose on MCHCP an obligation to grant premium rate increases above the CPI cap. Indeed, the contract gave MCHCP's board of trustees the discretion whether to grant such increases. The duty, however, did impose on MCHCP an obligation to exercise the discretionary power conferred by the contract in good faith, and this court found such a duty in *Martin v. Prier Brass Manufacturing Company*, 710 S.W.2d 466, 473 (Mo.App.1986).

In *Martin*, the plaintiffs brought a claim against their employer, Prier Brass, after it modified its employee health plan without notice to its employees. The plan did not require Prier Brass to give notice to its employees concerning termination of coverage, and the plan gave Prier Brass "the authority to construe the Plan and to determine all questions that arise under it." In finding that a duty of good faith and fair dealing was required under the contract, this court held:

> Prier Brass ... was bound to exercise the power conferred by the contract as interpreter of the terms an[d] arbiter of "all questions that arise under [the Plan]" in good faith. It will not do, as Prier Brass intimates in argument, to bind [the employees] to a construction of the contract that allows the employer to cancel the benefits to the employees under the Plan, and to do so without prior notice, merely because Prier Brass reads the contract to that effect.... The express Plan empowered Prier Brass as the exclusive determinant of the benefits due the employees ... under the contract. To deny them those expectations without notice merely because Prier Brass reads that notice is not due, not only impairs rights already vested, but also the contract duty of good faith.

*Id.* at 473; *see also Environmental Protection, Inspection, and Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo.App.2000).

The same is true in this case. The 1997 RFP contract granted discretion to MCHCP to determine whether Community should be given a rate increase; however, MCHCP was bound to exercise that discretion in good faith.

To establish a breach of the covenant of good faith and fair dealing, Community's burden was to establish that MCHCP exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny Community the expected benefit of the contract. *Ko-*

*ger v. Hartford Life Insurance Company,* 28 S.W.3d 405, 412 (Mo.App.2000); *Martin,* 710 S.W.2d at 473. The comments to RESTATEMENT (SECOND) OF CONTRACTS § 205 instruct:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness and reasonableness. . . .
>
> . . . .
>
> . . . Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Section 205, cmts. a and d (1981).

■ Community, however, did not make a submissible case that MCHCP exercised its discretion in such a manner as to evade the spirit of the 1997 RFP contract or so as to deny Community the expected benefit of the contract. Community essentially tried its breach of the covenant of good faith and fair dealing by focusing exclusively on MCHCP's refusal to permit it to increase its premiums over the CPI cap. The verdict directing instruction on Community's claims said:

> Your verdict must be for Community Health if you believe:
>
> *First,* Community Health requested a price increase over the CPI cap for calendar year 1999 supported by documentation of adverse claims experience and provided substantial evidence of a significant adverse financial condition in regard to the 1997 RFP Contract, and
>
> *Second,* Missouri Consolidated did not give Community Health a premium increase over the CPI cap for the calendar year 1999; and
>
> *Third,* by engaging in the conduct described in paragraph *Second,* Missouri Consolidated did not cooperate with Community Health to enable performance and the achievement of the expected benefits, and
>
> *Fourth,* Community Health was thereby damaged.

MCHCP's refusal to give Community a premium increase over the CPI cap did not, in and of itself, establish a breach of the duty of good faith and fair dealing. This is because the contract gave MCHCP's board of trustees discretion to determine whether a premium increase would be allowed. To establish a breach of the covenant of good faith and fair dealing, Community was obligated to present evidence that MCHCP exercised its discretion in such a way that evaded the spirit of the contract.

Community asserts that, in January 1998, it met with Meyer and requested a 43 percent rate increase. Community submitted documentation of its substantial losses and advised MCHCP through Meyer that, without a rate increase, it might have to close its business and to declare bankruptcy. MCHCP's board of trustees allowed Community to increase its premi-

ums three percent based on the CPI cap, but it denied an increase over the CPI cap. Community says that MCHCP told it that its losses were the result of mismanagement due to high medical costs and high administrative costs. Community disagreed and persisted in its belief that its losses resulted from inadequate premium rates. Community asserts that, because it submitted documentation of adverse claims experience and provided substantial evidence of a significant adverse financial condition, MCHCP breached its implied covenant of good faith and fair dealing by not granting the requested premiums increase. While MCHCP makes too much of the discretion element in the contract, Community makes too little of it.

By granting them discretion, the contract granted the trustees the power to say no to Community's request for a premium increase over the CPI cap, notwithstanding Community's providing "substantial evidence of a significant adverse financial condition in regard to this contract and pay[ing] for an audit of such data by a reputable and qualified third party to be selected by MCHCP." To conclude otherwise would render "discretion" meaningless. The spirit of the contract that Community entered into with MCHCP, therefore, contemplated that MCHCP could deny a request for a premium rate increase over the CPI cap.

To establish a breach of the covenant of good faith and fair dealing, Community's burden was to establish that MCHCP's trustees exercised its discretion in a manner contrary to good faith and fair dealing. Community presented no such evidence. When a decision is left to the discretion of one party, the question is not whether the party made an erroneous decision but whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion. *MacDougald Construction Company v. State Highway Department*, 125 Ga.App. 591, 188 S.E.2d 405, 406 (1972); *Dayan v. McDonald's Corporation*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958, 972 (1984). If we accepted Community's argument, we would be holding MCHCP liable for breach of the covenant of good faith and fair dealing solely because, according to Community, MCHCP made the wrong decision in not giving Community a premium rate increase over the CPI cap. That Community did not receive an increase in its premiums, however, does not convert MCHCP's exercise of its discretion to deny such increase into a breach of contract action.

Community did not present any evidence of bad faith on MCHCP's part in exercising its discretion to deny a premium rate increase over the CPI cap. It merely relied on the evidence that it supported its claim for a premium increase with documentation of adverse claims experience and provided substantial evidence of a significant adverse financial condition in regard to the contract.[4] That evidence, however, does not establish that MCHCP acted in bad faith. Indeed, Community acknowledges that MCHCP concluded that

---

4. Community also points to this evidence to establish MCHCP's lack of good faith and fair dealing: (1) MCHCP withheld crucial claims history and utilization information; (2) MCHCP knew that Community's initial bid was far less than MCHCP knew was necessary; (3) MCHCP told Community that its bid was too high and that it would have to submit a new, lower bid; and (4) MCHCP lured Community into expanding coverage to MCHCP's western region, increasing Community's membership from 2400 to nearly 9000 members. Such evidence, however, does not even pertain to whether MCHCP *exercised its discretion* to deny the rate increase above the CPI cap in breach of the covenant of good faith and fair dealing.

Community's losses resulted from mismanagement due to high medical costs and high administrative costs. We need not decide whether the decision to deny the premium rate increase above the CPI cap was erroneous. Given the evidence presented, Community did not make a submissible case that MCHCP exercised its discretion to deny the premium rate. increase above the CPI cap in breach of the covenant of good faith and fair dealing. The circuit court, therefore, erred in denying MCHCP's motions for directed verdict and for judgment notwithstanding the verdict in regard to Community's claim for breach of the covenant of good faith and fair dealing in connection with the 1997 RFP contract.[5]

**Retention of Jurisdiction**

■ MCHCP also complains that the circuit court erred in retaining jurisdiction to adjudicate Community's post-trial damage claims. In its final judgment, the circuit court announced that it would retain jurisdiction "to resolve matters pertaining to damages suffered by [Community] under the contracts since April 13, 2000[,] the date of the jury's verdict." Because Community did not make a submissible case on its claims for breach of warranty *ex contractu* and breach of the covenant of good faith and fair dealing, it appears that Community would not have any future damages arising from its claims for the circuit court to decide.

MCHCP also complains that the circuit court erred in conditioning the continuation of the RFP contracts upon the parties'

reaching an agreement on a new price. The circuit court concluded:

> MCHCP has the right, at its sole option, to extend the 1995 and 1996 RFP Contracts for up to four additional one year periods and to extend the 1997 RFP Contract for up to two additional one year periods, provided, however, that the parties establish a mutually agreeable rate (price). If a rate is not so established, [Community] may terminate the contracts upon 60 days advance written notice.

The jury found that MCHCP breached its obligation of good faith and fair dealing by refusing to grant Community a rate increase above the CPI cap in regard to the 1997 RFP contract and that MCHCP was liable for breach of warranty *ex contractu* for the 1995, 1996 and 1997 RFP contracts. We presume that the circuit court recognized that it would be inconsistent with the jury's verdict to require Community to continue to perform the contract at a rate that the jury apparently found was inadequate. The circuit court, therefore, retained jurisdiction "to resolve matters pertaining to the establishment of the rate (price) of continued coverage under the current contracts[.]" Again, however, because Community did not make a submissible case on its claims for breach of warranty *ex contractu* and breach of the covenant of good faith and fair dealing, it appears that the circuit court would have no legal basis for its conditioning the continuation of the contracts on the parties' agreeing to a new price.

5. Because we conclude that Community did not make a submissible case on its claim for breach of the covenant of good faith and fair dealing, we need not address MCHCP's contention that the circuit court erred in giving the verdict directing instruction on Community's claim for breach of the covenant of good

faith and fair dealing. We also need not address MCHCP's contention that the circuit court erred in refusing to grant its motions for a mistrial and a new trial on the grounds of the admission of "other horribles" evidence.

### Injunction Bond and Costs

 MCHCP also asserts that the circuit court erred as a matter of law in declining to release the $100,000 MCHCP paid into the court in lieu of a preliminary injunction bond and in assessing costs against MCHCP.[6] Because Community did not make a submissible case on its claims for breach of warranty ex *contractu* and breach of the covenant of good faith and fair dealing, the circuit court should release the $100,000 MCHCP posted in lieu of a bond and costs should not be assessed against MCHCP.

### Community's Cross Appeal

 In its cross-appeal, Community raised several issues in the event that this court ruled in MCHCP's favor in its appeal.[7] In its first point, Community claims that the circuit court erred in entering a permanent injunction against it. Community avers that MCHCP, besides having unclean hands in its transactions with Community, did not establish that it would be irreparably harmed without the injunction and that it did not have an adequate remedy at law. This point is moot because the RFP contracts involved in this case ended on December 31, 2000. " '[A] case is moot if a judgment rendered has no practical effect upon an existent controversy.' " *State of Missouri, ex rel. Chastain v. City of Kansas City*, 968 S.W.2d 232, 237 (Mo.App.1998) (citation omitted). "When an event occurs that makes a court's decision unnecessary or makes it impossible for the court to grant effectual relief, the case is moot and generally should be dismissed." *State of Missouri, ex rel. County of Jackson v. Missouri Public Service Commission*, 985 S.W.2d 400, 403 (Mo.App.1999). Because no live controversy exists concerning whether Community should be enjoined from breaching its obligations under the contracts, this issue is moot.

 Community also contends that the circuit court erred in denying its motion for judgment notwithstanding the verdict on its claims for express breach of contract of the 1995 and 1996 RFP contracts. Pursuant to Rule 72.01(b), a party must ask for a directed verdict at the close of all the evidence to be entitled to a judgment notwithstanding the verdict. *Manzella v. Gilbert–Magill Company*, 965 S.W.2d 221, 229 (Mo.App.1998). Community did not move for a directed verdict on this issue at trial; nor did it file a motion for a new trial on this issue. It, therefore, cannot now assert that the circuit court erred in denying its motion for judgment notwithstanding the verdict.

As to its remaining contentions on appeal, Community claims:

(1) The circuit court erred in denying Community's motion to increase the bond MCHCP paid into the court because the $100,000 MCHCP placed in escrow in the event that the preliminary injunction was wrongfully entered was grossly insufficient to cover Community's losses.

---

6. In its reply brief, MCHCP said that it withdrew its contention that the circuit court erred in declining to release the $100,000 MCHCP paid into the court in lieu of a preliminary injunction bond in light of Community's admission that the $100,000 serves to cap any liability of MCHCP to Community for damages relating to the issuance of the injunction.

7. MCHCP filed a motion to strike the appendix and other portions of Community's brief on appeal. Because we rule in MCHCP's favor on its issues on appeal and rule against Community, the issues raised in the motion to strike are moot.

(2) The circuit court erred in denying Community's motion for change of judge because Judge Berhardt Drumm's appointment as the trial judge in the case created the appearance of impropriety in that Judge Drumm was an MCHCP insured.

(3) The circuit court erred in denying Community's motion for change of trial venue from Cole County because a substantial number of Cole County residents were MCHCP insureds.

(4) The circuit court erred in denying Community's motion to strike MCHCP insureds and state employees from the jury panel and in denying Community's motions to strike such panelists for cause during the *voir dire* because those members had an interest in the outcome of the litigation in that they had an interest in preserving their current premium rates for health care coverage.

(5) The circuit court erred in overruling Community's objection to the testimony of MCHCP's actuarial expert regarding the length of the terms of the RFP contracts because such testimony constituted an impermissible legal opinion and invaded the province of the jury.

(6) The circuit court erred in overruling Community's objection to expert testimony and reports from Ron Meyer regarding an alternative measure of Community's damages because such testimony constituted impermissible expert testimony in that Meyer's opinions and reports were not disclosed to Community and Meyer was not qualified as an actuary to render such opinions.

Because we found that Community did not make a submissible case on its claims for breach of warranty *ex contractu* and breach of the covenant of good faith and fair dealing, we need not consider these points. In regard to most of the contentions, Community acknowledges that it was raising the issues in the interest of judicial economy so that we could provide the circuit court with guidance in the event that the case was remanded for a new trial. Because we are reversing the circuit court's judgment and not remanding the case for a new trial, we need not address Community's remaining contentions on appeal.

The circuit court erred in denying MCHCP's motions for directed verdict and for judgment notwithstanding the verdict in regard to Community's claims for breach of *warranty ex contractu* and breach of the covenant of good faith and fair dealing. We, therefore, reverse the circuit court's judgment.

THOMAS H. NEWTON, Judge, concurs.

HAROLD L. LOWENSTEIN, Judge, dissents in a separate opinion.

HAROLD L. LOWENSTEIN, Judge, concurring in part and dissenting in part.

## I. Did the Plaintiff Make a Case on the Counts for Misrepresentation and Breach of Covenant of Good Faith and Fair Dealing?

The central issue before the court is whether the defendant, a state entity seeking bids on health insurance for state workers, is liable to the plaintiff, Community, because it materially misrepresented facts about the contract Community was making a bid upon. The evidence favorable to the submissions showed that during the negotiations, the highest ranking person of MCHCP deliberately told the bidder that no historical figures were available to determine whether the former holder of the contract had made or lost money based on certain bid figures. Such financial information was available and showed that the incumbent insurer lost great sums of money based on a bid price in the neighborhood of what Community was about to bid.

Since the early twentieth century, the Supreme Court of the United States, in such cases as *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914), and *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), has held that in government contract cases, the government is liable to a contractor when it makes positive statements about material facts concerning the nature of the work in question when those statements are false. Most states have adopted this principle. *Robert E. McKee, Inc. v. City of Atlanta*, 414 F.Supp. 957, 959 (N.D.Ga.1976). The rationale in *McKee*, which concerns conditions of proposed government construction sites, applies equally to the facts here on soliciting bids for insurance:

> The reason for holding the government liable for certain material misrepresentations is simple: certain job site investigations are not expected to be performed by each and every bidder; rather, the government performs certain basic tests in order to provide each bidder with some information on which he may make his bid. If every bidder were required to perform all the investigations, even though the chance of receiving the bid was remote, the number of bids would decrease and the dollar amount of the bids would increase.

*Id.*

"Under general principles of contract and tort law, a party who conceals or fails to disclose material information to another is liable for fraud." *Howard Contracting, Inc. v. G.A. MacDonald Constr. Co.*, 71 Cal.App.4th 38, 83 Cal.Rptr.2d 590, 599 (1998). The general rule is that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentations if the contractor is unable to perform according to the contract provisions. *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 85 Cal.Rptr. 444, 466 P.2d 996, 1001 (Cal.

1970). "In the public construction context, however, the conduct of a public agency which would otherwise amount to a tortious misrepresentation is treated as a breach of contract. The underlying theory is that providing misleading plans and specifications constitutes a breach of implied warranty of correctness." *Howard*, 83 Cal.Rptr.2d at 599. In *Howard*, the city had knowledge that certain permits that the successful bidder had to obtain to finish the project in a timely manner would not be forthcoming. Similarly, South Dakota has held that government is liable to a contractor for breach of implied warranty when "*it misrepresents material facts through concealment or false statements.*" *Morris, Inc. v. State ex rel. S.D. Dept. of Transp.*, 598 N.W.2d 520, 523 (S.D.1999) (quoting *Mooney's, Inc. v. S.D. Dept. of Transp.*, 482 N.W.2d 43, 46 (S.D.1992)). *See also Peter Salvucci & Sons, Inc. v. State*, 110 N.H. 136, 268 A.2d 899 (1970).

Missouri law implies a covenant of good faith and fair dealing in every contract. *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo.App.1986). There appears no reason why this principle would not apply to an entity protected from tort action under sovereign immunity. *Cf. Envtl. Prot., Inspection, & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo.App.2000). As long as the party claiming the breach of this implied covenant presents substantial evidence of the lack of good faith and fair dealing, the case may go to the jury. *Id.* Allowing a contract action for compensatory damages when the contractor was induced into a contract with the government based on a government misrepresentation is not merely explained away as being the product of result-oriented "teetering jurists;" rather, it is based on the rationale in the out-of-state cases cited above that the government got the benefit of work at a price far lower than what the price would have been if it had not made the misrepresenta-

tion. *Clark v. City of Humansville,* 348 S.W.2d 369, 371 (Mo.App.1961).

The cases referred to *supra* all contain a common theme. It should make no difference that the majority of caselaw on the subject comes from cases where construction contracts were involved and faulty government specifications were supplied. The rationale behind all of the construction cases equally applies to incorrect representations made by a governmental entity to induce a contractor to enter into any type of government contract or lease. *See St. Louis Air Cargo Svcs., Inc. v. City of St. Louis,* 929 S.W.2d 821 (Mo.App.1996). The government cannot induce by positive representation, which is incorrect, a party into entering into a contract that is totally unfair and unjust or gives the government a windfall, and then avoid compensatory damages in a suit in contract. *Ideker, Inc. v. Mo. State Highway Comm'n,* 654 S.W.2d 617, 620–21 (Mo.App.1983); *Sanders Co. Plumbing & Heating Inc. v. City of Independence,* 694 S.W.2d 841, 845 (Mo. App.1985). Missouri belongs to the majority of states that allows a contract action in these types of cases where there has been a positive misrepresentation. *Ideker,* 654 S.W.2d at 620–21. Governmental entities may not make false representations and avoid suits in contract merely because the theory behind such suits smack of tort—this is especially so where the result would be fundamentally unfair:

> What is and what is not a 'positive representation' will always be a question to be answered by the trier of fact case-by-case. But, if those in charge of a public project wish to eliminate that question from disputes with their contractors, they may do so in advance ... by making very sure that any representations they make are accurate.

*Sanders,* 694 S.W.2d at 847.

In sum, in this case, the representations of the defendant state entity that financial figures were unavailable were incorrect. This past history was most material to the bid of the plaintiff, and allowed, in the words of Judge Somerville in *Ideker,* "pragmatically speaking" to get a benefit because the performance of the contract by the contractor entailed "more expense than was calculated in submitting his bid, [and, thus,] the governmental entity should bear the added cost." *Id.* at 621. The facts in the case at bar cannot be distinguished from those in *St. Louis Air Cargo,* where the city by words and conduct made assertions to the potential contractor that were not in accordance with the truth and made to deceive. 929 S.W.2d at 826. The fact that the misrepresentations made by the persons who represented the city and the airport were not in the contract itself, or in the bidding documents, did not defeat the cause of action. *Id.* In the case at bar, a reasonable person would attach importance to the comments of the executive director of MCHCP in determining whether or not to bid on the contract; therefore, the case was submissible and the judgment on the verdict should be affirmed. *Id.* Both counts of Community's claims were submissible. Reasonable minds could differ as to whether Community made a submissible case; therefore, this court should not set aside the verdict where the defendant knew its representation was false and incorrect. *Massman Constr. Co. v. Mo. Highways & Transp. Comm'n,* 31 S.W.3d 109, 112–13 (Mo.App.2000). A contrary result allows the state entity a windfall at the expense of a private contractor who dealt in good faith. I would affirm.

## II. Retention of Jurisdiction

Based upon a determination that Community made a submissible case of its contract actions, I would affirm the trial court's retention of jurisdiction to determine the amount of damages flowing from

losses sustained by Community in the final years of the contract's existence. Although an action for damages is generally considered legal rather than equitable, *Jaycox v. Brune*, 434 S.W.2d 539, 542–43 (Mo.1968), the trial court here also obtained equity jurisdiction, and as such the court retains such jurisdiction as long as there has been no loss of equity jurisdiction. *State ex. rel. Willman v. Sloan*, 574 S.W.2d 421, 422–23 (Mo. banc 1978). A trial court will then retain equity jurisdiction until full and complete justice have been administered as within the scope of the pleadings and the evidence. *Craig v. Jo B. Gardner Inc.*, 586 S.W.2d 316, 325 (Mo. banc 1979); *Gray v. White*, 26 S.W.3d 806, 821 (Mo.App.1999).

Under the facts in this case, it would be in the interest of judicial economy for the court to determine damages in this action, rather than require the party who has made a case and obtained a verdict to refile each year to obtain full relief. The majority decision makes this point academic as would Community's statement in its brief that if it was found it had made a submissible case and this court reversed only on this jurisdictional point, that it would gladly refile on the issue of damages.

Finally, I would grant MCHCP's motion to strike the appendix to Community's brief. The appendix contains a proposed settlement between the parties which does not appear to have been a part of this extensive record.

### III. Injunction Bond

MCHCP, in its reply brief, withdrew the request for relief it raised in Point X. Therefore, it is unnecessary to analyze this point.

### IV. Costs

The trial court assessed costs against MCHCP, a state entity created by statute to serve as a health care plan for state employees. Though I believe the verdict should be affirmed, the ruling of costs against a state entity should not stand where there is no specific statute permitting such assessment. *Mauer v. Bd. of Trustees of Mo. State Employees' Ret. Sys.*, 762 S.W.2d 517, 521 (Mo.App.1988). This point in MCHCP's appeal should be granted.

### V.

I believe the remaining points in MCHCP's brief, including those dealing with damages and instructional error should be denied. Likewise, the points raised by Community in its cross-appeal should be denied. After dismissing appellant's point on the injunction bond, I would affirm the trial court's judgment in all respects except as to the assessment of costs and deny the points raised in Community's cross appeal.